IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Personal Restraint of: | No. 82309-4-I |
| MATTHEW L. CHRISTENSON | DIVISION ONE |
| Petitioner. | UNPUBLISHED OPINION |

ANDRUS, C.J. — In 2014, Matthew Christenson moved into the home of his girlfriend, P.B., where he spent three months abusing her two sons before this abuse led to the death of P.B.'s severely autistic 18-year-old son. A jury found Christenson guilty of seven charges, including homicide by abuse, several counts of assault, and unlawful imprisonment. It also found the existence of several statutory aggravators. He now seeks relief from one of the assault convictions and the unlawful imprisonment conviction.

In this personal restraint petition he contends, and the State concedes, that his conviction for homicide by abuse and one count of second degree assault violate double jeopardy. He further argues that he received ineffective assistance of counsel when counsel failed to propose a particular jury instruction and that the State did not present sufficient evidence to support his conviction for unlawful imprisonment.

We vacate Christenson's second degree assault conviction in count three and remand for resentencing. We reject the remainder of his arguments.

Citations and pin cites are based on the Westlaw online version of the cited material.

FACTS

In 2014, P.B., a special education teacher, lived in Auburn with her two sons, 13-year-old J.C. and 18-year-old O.S. O.S. was severely autistic and had the mental age of a toddler, requiring assistance with many daily tasks, including eating, dressing, using the toilet, and cleaning himself. He was largely unable to speak and would sometimes engage in minor self-harming behaviors including scratching and pinching himself.

On January 22, 2014, P.B. posted an advertisement on Craigslist looking for a casual romantic partner. Christenson responded to her post and, after texting for about a week, they met for drinks. The next morning, P.B. invited Christenson and his 20-year-old son, who were homeless at the time, to stay with her until they found their own place to live.

Christenson quickly took control over the lives of P.B.'s family. Before he moved in, O.S. and J.C. each had their own room while their mother slept in the apartment living room. Within two or three weeks of moving in, Christenson had moved J.C. into the bathroom. J.C., upset that Christenson was living with them, threatened suicide—but never actually injured himself—because he wanted to scare his mom. The mother took J.C. to the hospital and, when the hospital did not commit J.C. for treatment, Christenson forced him to live in the bathroom without bedding of any kind and without the freedom to leave. Christenson told the mother that J.C.'s confinement was necessary because the child was "possessed by evil spirits." Shortly thereafter, Christenson also moved O.S. into the bathroom, forcing him to sleep in the bathtub. P.B. did not intervene because she "thought [Christenson] was trying to help us."

Christenson, believing the family was unhealthy and overweight, also took control of the cooking and placed O.S. and J.C. on a strict diet. He threw away the food they had in their cupboards and severely restricted O.S. and J.C.'s food intake. Christenson even forced the children to eat hot peppers to regulate their bowel movements. And Christenson forced J.C. and O.S. to exercise for hours at a time. As part of this exercise, Christenson made J.C. walk up and down the apartment stairwell for entire days, until the neighbors became concerned. Christenson sometimes made J.C. exercise with no clothes on, ridiculing J.C.'s genitals, so that his mother would be ashamed of "how fat [her] son was." After Christenson allowed J.C. and O.S. to stop exercising, he forced them to sit in ice baths, sometimes for hours.

Christenson was frequently physically violent with the children for seemingly minor reasons, such as expressing a negative opinion about the food he prepared or trying to add warm water to their bath. Christenson once hit O.S. in the testicles with O.S.'s favorite toy as punishment for trying to hold his mother's hand, and his testicles became so bruised that P.B. took him to the hospital. Christenson rubbed hot pepper powder into the children's eyes. On one occasion, Christenson held O.S. under water until he passed out. While beating J.C., Christenson told him that "I don't know why I just don't end it now" which J.C. interpreted as a threat to kill him. Christenson even brought a stun gun to the home and tested it on O.S.

Christenson also psychologically abused the boys. He did not allow P.B. and her children to talk or look at each other or "have any kind of contact." Christenson called J.C. "hateful and disgusting" and told P.B. that O.S. was "smarter than what he was letting on" and just "manipulating [her] to try to take

advantage so that he could be lazy." Christenson called O.S. a "nuisance" and a waste of his time. He repeatedly called the children names and told their mother that they were "ugly, worthless pieces of shit." Christenson refused to allow J.C. and his mother to take their prescribed mental health medications and threw them away.

Despite the physical and psychological abuse, P.B. never called the police, never told Christenson to stop, and never asked him to leave.

On March 5, 2014, approximately one month after Christenson moved in, P.B. took O.S. to see a medical professional about bruises on his testicles. Because he was nonverbal, O.S. was unable to report what had happened to him. The mother told the medical staff that O.S. had injured himself, later admitting this story was a lie. A few days later, P.B. took O.S. to the emergency room at Children's Hospital. The doctors noted that O.S. had extensive bruising and his body was covered in scratches. Again, the mother told hospital staff that O.S.'s injuries were self-inflicted. But medical staff did not observe any self-injurious behavior during O.S.'s hospitalization. O.S. was discharged on March 20, 2014.

On March 24, 2014, O.S. was admitted to the Yakima Valley School, a respite center for the developmentally disabled. O.S. was again covered in extensive bruising. P.B. lied to the staff and told them that the injuries occurred when O.S. fell down stairs. On April 10, when she went to retrieve O.S., he did not want to go with her. Scared, O.S. removed his seatbelt and tried to jump out of the car as P.B. was driving on the freeway.

Sometime between April 12 and April 13, 2014, O.S. died. J.C. testified that on that night, he and O.S. were sitting in their ice bath when Christenson and P.B.

came and took O.S. out of the bath. They came back after 15 minutes and let J.C. out of the bath, at which point he curled up on the floor and went to sleep.

The mother testified that she saw Christenson remove O.S. from the bathroom, but she went into the other bathroom to attend to their cannabis plants. When she came out into the living room an hour later, she saw O.S. lying on the floor with a chair and sheet on top of his body. According to P.B., O.S. had a sock in his mouth and his hands and mouth were bound in duct tape. Christenson was sitting about 10 feet away, drinking and smoking. P.B. further testified that she saw O.S. gasp for breath, at which point she removed the chair, sheet, duct tape, and sock. She attempted CPR but, when she realized her efforts to revive O.S. had been unsuccessful, washed and dressed O.S. before calling 911. P.B. decided to take O.S. to the hospital herself rather than wait for an ambulance to arrive.

J.C. testified that, in the middle of the night, Christenson pulled him out of the bathroom and told him to perform CPR on his brother who was lying motionless on the floor. J.C. continued CPR on O.S. as they drove to the hospital.

O.S., however, had no vital signs and "no signs of life whatsoever" when they arrived at the hospital and was pronounced dead shortly after they arrived. P.B. told emergency medical technicians (EMTs) and hospital staff that she had woken up earlier that morning and could not hear O.S. moving or breathing. She did not explain what happened or why he was not breathing.

The medical examiner conducted a partial autopsy on O.S. the day after his death. He noted some bruises and abrasions on O.S.'s body and discovered bleeding beneath his scalp. But the autopsy did not reveal what had caused O.S.'s

death. While the medical examiner felt O.S.'s injuries were a "red flag," he also felt there was a plausible alternative, which was generally corroborated by the information available to him, so he gave the mother the benefit of the doubt. The medical examiner concluded that O.S.'s manner of death was natural.

P.B. and Christenson continued to live together after O.S.'s death. Christenson claimed that O.S.'s death had taken the "evil spirits" from the apartment and he moved J.C. from the bathroom to a bedroom. While J.C. did not have a bed, Christenson did give him blankets and a pillow. About a week later, J.C. moved away to live with his grandparents. Before J.C. left Christenson warned him not to tell anyone about any of the things that had happened.

Following O.S.'s death, P.B. inconsistently reported what had happened to him. She told a coworker that O.S. had died with a blanket in his mouth. Later, in June 2014, when P.B.'s coworker, Mary Stroh, was driving her home after a work party, the mother, drunk and upset, confided in Stroh that O.S. had died because Christenson "put a sock in his mouth and put tape over his mouth and was beating him all over his body."

Eight months after O.S. died, on December 22, 2014, P.B. checked herself into a hospital. She initially reported that she had been kidnapped, but when police confronted her with evidence to the contrary, she admitted that she faked the kidnapping. She then reported feeling suicidal and, when hospital staff questioned her about this, she told them it "had been a difficult year" and began to confide in them about Christenson. She explained how Christenson had abused her sons and how she had lied to protect him. She reported that, on the day of his death, she had found O.S. with a sock in his mouth, which Christenson had duct taped

closed, and confessed to helping cover up his actions by washing the tape residue from O.S.'s face after he died.

Hospital staff reported P.B.'s allegations to law enforcement and, based on this information, the medical examiner reevaluated O.S.'s autopsy. The medical examiner changed the manner of death from natural to undetermined. He was unable to identify a specific cause of death from his original autopsy findings but testified that asphyxia from a sock was consistent with the earlier results.

The mother later pleaded guilty to misdemeanor rendering criminal assistance for lying to hospital staff about O.S.'s injuries in March and pleaded guilty to felony rendering criminal assistance for lying to medical providers about the circumstances surrounding O.S.'s death.

The State charged Christenson with homicide by abuse, the alternative of second degree murder, and assault in the second degree,[1] felony harassment and unlawful imprisonment. The jury convicted Christenson as charged. The trial court vacated the second degree murder conviction as a violation of double jeopardy and imposed an exceptional sentence of 780 months for the homicide by abuse based on jury findings of four separate aggravating factors. The court imposed the statutory maximum for the remaining counts, except for the felony harassment, to which no aggravators applied.

---

[1] The State charged Christenson with three counts of second degree assault, two of which, counts three and four, were for the infliction of pain equivalent to torture and were based on Christenson's ongoing course of abuse of O.S. and J.C., respectively. The third charge of second degree assault—count seven—was for Christenson's suffocation or strangulation of O.S., either by holding his head underwater or by placing him in headlock until he passed out. Christenson is only challenging count three in this Personal Restraint Petition.

On direct appeal, Christenson challenged the court's refusals to appoint new counsel or to order a competency evaluation during trial. State v. Christenson, No. 77463-8-I, noted at 9 Wn. App. 2d 1093 (2019). This court affirmed his convictions. Christenson subsequently filed this timely Personal Restraint Petition (PRP).

ANALYSIS

In a PRP, this court will grant relief to a petitioner who is subject to an unlawful restraint. RAP 16.4(a). The restraint is unlawful if it violates the Constitution of the United States or the Constitution or laws of the State of Washington. RAP 16.4(c)(2). Relief by way of a collateral challenge to a conviction is extraordinary and a petitioner must meet a high standard before this court will disturb an otherwise settled judgment. In re Pers. Restraint of Coats, 173 Wn.2d 123, 132, 267 P.3d 324 (2011). To obtain relief through a PRP based on a constitutional error, a petitioner must show two things: (1) a constitutional error occurred and (2) the error resulted in actual and substantial prejudice. In re Pers. Restraint of Williams, 198 Wn.2d 342, 352, 496 P.3d 289 (2021).

Double Jeopardy

Christenson challenges, on double jeopardy grounds, his convictions for homicide by abuse and one of his convictions for assault in the second degree. He argues that the course of conduct required to prove the pattern or practice of assault or torture underlying his homicide by abuse conviction also proved all the elements of second degree assault in count three and that these two convictions violate double jeopardy.

- 8 -

Both our federal and state constitutions protect persons from being twice put in jeopardy for the same offense. See U.S. CONST. AMEND. V; WASH. CONST. art. I, § 9. The protection against double jeopardy prevents a person from being (1) prosecuted for the same offense after acquittal, (2) prosecuted a second time for the same offense after conviction, or (3) subjected to multiple punishments for the same offense. State v. Fuller, 185 Wn.2d 30, 33-34, 367 P.3d 1057 (2016). This court reviews double jeopardy claims de novo. State v. Womac, 160 Wn.2d 643, 649, 160 P.3d 40 (2007).

When a defendant's act supports convictions under two criminal statutes, a court considering a double jeopardy challenge "must determine whether, in light of legislative intent, the charged crimes constitute the same offense." In re Pers. Restraint of Orange, 152 Wn.2d 795, 815, 100 P.3d 291 (2004). Our Supreme Court has adopted a four-part analytical framework to guide this determination. First, we search for express or implicit legislative intent to punish the crimes separately; if this intent is clear, then we look no further. State v. Freeman, 153 Wn.2d 765, 771-72, 108 P.3d 753 (2005). Second, if there is no clear indication of legislative intent, we apply the "same evidence" or "same elements" test[2] to the charged offenses. Id. at 772. It is not enough to merely "compare the statutory elements at their most abstract level." Orange, 152 Wn.2d at 818. We must also consider the elements of the crimes both as charged and as proved. Freeman, 153 Wn.2d at 777. The question we must answer is "'whether each provision requires proof of a fact which the other does not.'" Orange, 152 Wn.2d at 818

---

[2] The same evidence test mirrors the test set forth in Blockburger v. United States, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932). State v. Louis, 155 Wn.2d 563, 569, 120 P.3d 936 (2005).

(quoting Blockburger v. United States, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932)).

Third, when legislative intent is unclear, we also consider whether the merger doctrine is applicable. In re Pers. Restraint of Knight, 196 Wn.2d 330, 337, 473 P.3d 663 (2020) (citing Freeman, 153 Wn.2d at 772). Last, even if the two convictions appear to be for the same offense or for charges that would merge, they may be punished as separate offenses if there is an independent purpose or effect to each. Id. (quoting Freeman, 153 Wn.2d at 773).

A person is guilty of homicide by abuse if "under circumstances manifesting an extreme indifference to human life, the person causes the death of . . . a developmentally disabled person, . . . and the person has previously engaged in a pattern or practice of assault or torture of said . . . developmentally disabled person." RCW 9A.32.055(1) (emphasis added). As charged in this case, a person is guilty of assault in the second degree if he "under circumstances not amounting to assault in the first degree . . . [k]nowingly inflicts bodily harm which by design causes such pain or agony as to be the equivalent of that produced by torture." RCW 9A.36.021(1)(f) (emphasis added). There is no explicit legislative language in these statutes authorizing a court to impose multiple punishments for both homicide by abuse and second degree assault when the latter crime constitutes a part of the pattern or practice of the former. We therefore move on to evaluate the two crimes under the "same evidence" test.

To qualify as the "same offense" under the same evidence test, the two offenses must be the same, both in law and in fact. State v. Arndt, 194 Wn.2d 784, 815, 453 P.3d 696 (2019). "If each offense includes an element not included in

the other, and each requires proof of a fact the other does not, then the offenses are not constitutionally the same under this test." State v. Hughes, 166 Wn.2d 675, 682, 212 P.3d 558 (2009). We consider how the crimes were actually charged, not just their abstract elements. In re Pers. Restraint of Francis, 170 Wn.2d 517, 523-24, 242 P.3d 866 (2010).

Here, the offenses are not the same in law because each offense includes an element not included in the other. Homicide by abuse requires the State to prove that the victim was a vulnerable child or adult and that the victim died. Second degree assault does not require either showing but does require that the State prove that the victim suffered pain and agony. Cf. RCW 9A.32.055(1); RCW 9A.36.021(1)(f). Additionally, second degree assault requires the State to prove a higher mens rea of specific intent, whereas homicide by abuse requires proof of "extreme indifference." See RCW 9A.36.021(1)(f) (requiring proof of knowing infliction of harm); RCW 9A.32.055(1) (requiring proof of extreme indifference to human life). Because of these differences, proof of one does not necessarily prove the other. Thus, these offenses are not the same in law.

But Christenson argues, and the State conceded at oral argument, that, under the facts of this case, these offenses are the same in fact. The evidence on which the State relied to prove that Christenson had engaged in a pattern or practice of assault or torture is the same evidence it relied on to prove that Christenson had knowingly inflicted bodily harm designed to cause pain or agony equivalent to that produced by torture. During closing argument, the State told the jury that the assault at issue for count three was different from the acts leading to O.S.'s death—"for [O.S.], this is everything else." The State argued that the

assault as charged in count three was based on "a continuing course of conduct" based on "what those boys went through during that period of time, what was happening in that apartment daily for three months: the physical assaults; the deprivation; the degrading and demeaning things that were said and done to those boys." But those same acts—"everything else"—necessarily make up the pattern or practice of assault or torture. Thus, the "conviction for homicide by abuse relied on the same proof the State used to demonstrate every element of assault in the second degree. Accordingly, we accept the State's concession that Christenson's convictions for homicide by abuse and for second degree assault in count three are the same in fact and, as such, violate double jeopardy.

<u>Resentencing</u>

The remedy for a violation of double jeopardy protections is to vacate the lesser conviction. State v. Weber, 159 Wn.2d 252, 269, 149 P.3d 646 (2006). Accordingly, we vacate the second degree assault conviction and leave Christenson's conviction for homicide by abuse undisturbed because homicide by abuse is a more serious offense. See RCW 9A.32.055(3) (homicide by abuse is a class A felony); RCW 9A.36.021(2)(a)(second degree assault is a class B felony).

The State contends that, despite the double jeopardy violation, resentencing is not required because the record demonstrates that the court would have imposed the same exceptional sentence absent any error. When a defendant's conviction is based on an incorrect offender score or incorrectly calculated standard range "remand is the remedy unless the record clearly

indicates the sentencing court would have imposed the same sentence anyway." State v. Parker, 132 Wn.2d 182, 189, 937 P.2d 575 (1997).

The trial court sentenced Christenson based on an offender score of eight, which included the second degree assault conviction in count three. With this offender score, the standard range for homicide by abuse is 370 to 493 months. But with the second degree assault conviction vacated, Christenson's offender score drops to six and the standard range for homicide by abuse drops to 312 to 416 months. See RCW 9.94A.510.

The court imposed an exceptional sentence of 780 months based on jury findings of deliberate cruelty to the victim, knowledge that the victim was particularly vulnerable or incapable of resisting, the use of a position of trust or confidence to facilitate the commission of the crime, and the crimes were aggravated domestic violence offenses. This sentence was consistent with the State's request for an exceptional sentence of 65 years.[3]

The State argues that the sentencing hearing demonstrates that Christenson's exceptional sentence was justified by the jury's findings of four aggravating factors which Christenson does not challenge here and that the court indicated it would have imposed the same sentence regardless of any changes to the offender score. We do not agree that the sentencing hearing demonstrates this clear judicial intent.

While the trial court deemed the aggravating circumstances sufficient to justify a 780 month sentence, the State framed its request as based on the high

---

[3] The court also imposed the statutory maximum sentence of 120 months for the assault in count 3, as the State requested.

- 13 -

end range sentence of 493 months plus an additional 287 months for the exceptional portion of the total sentence. We do not have a clear indication if the court felt a total of 65 years was appropriate for the homicide by abuse conviction, regardless of the underlying range, or if it felt the additional 287 months was the appropriate amount of time to add to the high end standard range sentence. And the court did not clearly indicate whether a change in Christenson's offender score would change the court's sentence.

Because we are unsure whether a lower standard range would have resulted in a lower total sentence, we are "hesitant to affirm an exceptional sentence where the standard range has been incorrectly calculated because of the great likelihood that the judge relied, at least in part, on the incorrect standard ranges in his calculus." Parker, 132 Wn.2d at 190.

Accordingly, we vacate Christenson's second degree assault conviction in count three and remand for resentencing.

Ineffective Assistance of Counsel

Christenson argues that his defense counsel was ineffective by failing to request an instruction informing the jury that the mother's testimony was inherently unreliable. Because Christenson has failed to demonstrate that his counsel's performance was deficient or that he experienced any prejudice, we reject this argument.

Under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution, a defendant in a criminal proceeding is guaranteed the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 684-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984);

State v. Grier, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). To establish ineffective assistance of counsel, a defendant must demonstrate both (1) that counsel's representation fell below an objective standard of reasonableness and (2) that counsel's representation resulted in prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Because the defendant must show both prongs, a failure to demonstrate either prong will end the inquiry. State v. Classen, 4 Wn. App. 2d 520, 535, 422 P.3d 489 (2018).

We strongly presume that counsel's representation was effective. Grier, 171 Wn.2d at 33. To overcome this presumption, Christenson must show the absence of any legitimate strategic or tactical reason explaining defense counsel's challenged conduct. State v. Emery, 174 Wn.2d 741, 755, 278 P.3d 653 (2012). Where the ineffective assistance of counsel is based on the failure of trial counsel to request a jury instruction, the court must find that the defendant was entitled to the instruction, that counsel's performance was deficient in failing to request it, and that the failure prejudiced the defendant. Classen, 4 Wn. App. 2d at 539-40; State v. Johnston, 143 Wn. App. 1, 21, 177 P.3d 1127 (2007).

Christenson asserts that his defense counsel was ineffective for failing to request the following cautionary jury instruction regarding the untrustworthiness of P.B.'s testimony:

> Testimony of an accomplice, given on behalf of the [State] [City] [County], should be subjected to careful examination in the light of other evidence in the case, and should be acted upon with great caution. You should not find the defendant guilty upon such

testimony alone unless, after carefully considering the testimony, you
are satisfied beyond a reasonable doubt of its truth.

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 6.05, at 197 (5th ed. 2021) (WPIC). A failure to give the instruction may be reversible error where the prosecution relies solely on an accomplice's uncorroborated testimony to establish the defendant's guilt. In re Pers. Restraint of Sandoval, 189 Wn.2d 811, 824, 408 P.3d 675 (2018) (citing State v. Harris, 102 Wn.2d 148, 155, 685 P.2d 584 (1984), overruled on other grounds by State v. McKinsey, 116 Wn.2d 911, 914, 810 P.2d 907 (1991)).

We need not decide whether Christenson was entitled to the requested instruction at trial because, even assuming he was, he cannot show that his trial counsel was deficient for failing to request it or that he suffered any prejudice from the alleged failure.

A defendant does not establish ineffective assistance simply by identifying an instruction that would likely have been given had it been requested. State v. Cienfuegos, 144 Wn.2d 222, 227, 25 P.3d 1011 (2001). While the trial court may have given this cautionary instruction, had Christenson requested it, he has not demonstrated the absence of any legitimate strategic or tactical reason underpinning counsel's decision to forego such request.

Here, it is more than conceivable that defense counsel strategically chose not to seek the instruction because it undercut the defense's theory of the case—that O.S.'s death was accidental and not caused by any action Christenson took and that P.B.'s testimony regarding the homicide was not credible. After highlighting the mother's inconsistent versions of events and many of her lies,

defense counsel argued in closing that P.B. was not credible and therefore the jury should not believe her story that Christenson caused O.S.'s death. Because the defense's contention throughout trial was that no crime had occurred and P.B. was lying about Christenson's actions, it would have been inconsistent to insist that she was an accomplice to a crime he asserted had not happened.

Because counsel's decision not to seek the instruction can be attributable to legitimate trial tactics, Christenson has failed to demonstrate deficient performance.

Christenson similarly cannot demonstrate prejudice. Defense counsel's efforts at trial were largely focused on attacking the mother's credibility. Counsel elicited evidence that she had serious mental health issues and a history of drug use, and he stressed the continuing inconsistencies in her versions of events. Counsel further highlighted how she failed to intervene and even lied to conceal Christenson's crimes and to protect him. Defense counsel addressed P.B.'s credibility at great length during closing arguments, arguing that she "has a tendency to spin wild tales."

While the trial court did not specifically caution jurors to closely examine the testimony of any accomplices, they were instructed that they were "the sole judges of the credibility of each witness" and "the value or weight to be given to the testimony of each witness." They were further instructed to consider "any personal interest that the witness might have in the outcome or the issues" as well as "any other factors that affect" the jurors' valuation of a witness' testimony. Given these general instructions that the jury should consider the personal interest and bias of all witnesses, including P.B., and counsel ensured that the jurors were aware of

- 17 -

evidence casting doubt on P.B.'s credibility, Christenson cannot demonstrate a reasonable probably that the outcome of the trial would have been different had the court instructed the jury consistent with WPIC 6.05.

Because Christenson's counsel's failure to request the instruction was a legitimate trial strategy given the circumstances of the case and because Christenson cannot demonstrate prejudice here, he has not shown that he received ineffective assistance of counsel.

Sufficiency Evidence of Unlawful Imprisonment

Finally, Christenson argues that his conviction for unlawful imprisonment was not supported by sufficient evidence because the State failed to prove that he knowingly acted without consent or legal authority.

Due process requires that the State prove each element of a charged offense beyond a reasonable doubt. State v. Chacon, 192 Wn.2d 545, 549, 431 P.3d 477 (2018). We review the sufficiency of the evidence de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). Evidence is sufficient to support a conviction if, viewed in the light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. State v. Elmi, 166 Wn.2d 209, 214, 207 P.3d 439 (2009). A defendant's claim of insufficiency "admits the truth of the State's evidence and all inferences that reasonably can be drawn" from it. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial and direct evidence are equally reliable. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

To convict Christenson of unlawful imprisonment, the State had to prove that he knowingly restrained J.C. RCW 9A.40.040(1). Under RCW 9A.40.010(6), "restrain" is defined as:

> "Restrain" means to restrict a person's movements without consent and without legal authority in a manner which interferes substantially with his or her liberty. Restraint is "without consent" if it is accomplished by (a) physical force, intimidation, or deception, or (b) any means including acquiescence of the victim, if he or she is a child less than sixteen years old or an incompetent person and if the parent, guardian, or other person or institution having lawful control or custody of him or her has not acquiesced.

Here, jury instruction 24, the to-convict instruction, identified the elements the State had to prove beyond a reasonable doubt:

> (1) That between January 1, 2014 and May 10, 2014, the defendant restrained the movements of [J.C.] in a manner that substantially interfered with his liberty;
> (2) That such restraint was without [J.C.]'s consent, as it was accomplished by physical force, intimidation, or deception;
> (3) That such restraint was without legal authority;
> (4) That, with regard to elements (1), (2), and (3), the defendant acted knowingly; and
> (5) That any of these acts occurred in the State of Washington.

<u>"Without Consent"</u>

Christenson argues that, because J.C. was 13 years old at the time of the offense, the State was required by RCW 9A.40.010(6)(b) to demonstrate that Christenson acted without P.B.'s consent. He contends the evidence proved that J.C.'s mother acquiesced in his actions and the State cannot prove he acted without her authorization. Christenson's argument is premised on the assertion that whenever the victim is under the age of 16, the State must prove that a defendant acted without parental consent, even if the State alleges that the

- 19 -

restraint occurred through physical force or intimidation of the child under RCW 9A.40.010(6)(a). We reject this contention.

First, Christenson did not raise this issue at trial or request a jury instruction to support this argument. The to-convict instruction required the State to prove that Christenson's restraint of J.C. was "without J.C.'s consent, as it was accomplished by physical force, intimidation, or deception." Christenson did not object to the instruction as given, nor did he propose a different instruction or raise any concerns even when the court addressed this element of the instruction specifically.

Second, the statutory language does not support Christenson's position. We review issues of statutory interpretation de novo. State v. Dennis, 191 Wn.2d 169, 172, 421 P.3d 944 (2018). The purpose of statutory interpretation is to give effect to the intent of the legislature. State v. Sweany, 174 Wn.2d 909, 914, 281 P.3d 305 (2012). To derive legislative intent, we look to the "plain language enacted by the legislature, considering the text of the provision in question, the context of the statute in which the provision is found, related provisions, and the statutory scheme as a whole." State v. Evans, 177 Wn.2d 186, 192, 298 P.3d 724 (2013). If the statute's meaning is unambiguous, our inquiry ends. State v. Armendariz, 160 Wn.2d 106, 110, 156 P.3d 201 (2007).

RCW 9A.40.010(6) provides two alternative definitions of what it means to restrain a victim "without consent." Restraint without consent can be accomplished by "physical force, intimidation, or deception." RCW 9A.40.010(6)(a). This is the form of restraint alleged by the State in this case. Alternatively, restraint without consent can be defined as a restraint by "any means" —including those lacking

- 20 -

physical force, intimidation, or deception —but only in cases involving victims who are younger than 16 where a parent or guardian does not acquiesce. RCW 9A.40.010(6)(b). Nothing in the plain language of this definition dictates that the State <u>must</u> prove a lack of consent as defined under subsection (6)(b) every time the victim is younger than 16 years old when the State elects to prove lack of consent under subsection (6)(a). Indeed, RCW 9A.40.010(6) discusses the two alternative means using the disjunctive "or."

Christenson relies on <u>State v. Billups</u>, 62 Wn. App. 122, 813 P.2d 149 (1991) and <u>State v. Simms</u>, 95 Wn. App. 910, 977 P.2d 647 (1999) to support his contention that the definition in subsection (6)(b) must be applied every time a victim is younger than 16. Neither case advances his position.

In <u>Billups</u>, the defendant was convicted of attempted kidnapping after he approached two girls, ages 10 and 11, who were walking along the road, and tried to entice them into his van. 62 Wn. App. at 124. On appeal, this court interpreted the statutory definition of "abduct" when evaluating whether there was sufficient evidence supporting his conviction. <u>Id.</u> at 126-27. Under RCW 9A.40.010(1), "abduct" is defined as restraining a person under the same definition as used here: restricting a person's movements without consent and without legal authority. The court concluded that there was sufficient evidence to prove that the defendant attempted to entice the young girls into his van and that, had they complied, their movements would have been restrained without consent because they were both under the age of 16 and no parental consent had been given. <u>Id.</u>

In <u>Simms</u>, the defendant was hired as a live-in caretaker for Anita Brateng's elderly father. 95 Wn. App. at 911. Following a family dispute, Brateng attempted

to fire Simms but Simms refused to leave. Id. at 912. Later, Simms took the father away in the car over Brateng's protests and against the directive of the police. Id. Simms was convicted of kidnapping in the second degree, which she appealed, arguing the State had failed to prove that she had restrained the father without consent. Id. at 912-13. On appeal, Division Two examined whether the restraint was without consent based on the State's theory that the father was an incompetent person whose legal guardian had not acquiesced. Id. at 913.

These cases are distinguishable. It is unclear from the opinions whether the State in either Billups or Simms charged that the defendant restrained another through physical force, intimidation, or deception. Here, by contrast, the to-convict instruction relied on the definition of "without consent" of RCW 9A.40.010(6)(a) — that J.C.'s restraint was without consent because he had been physically forced, intimidated, or deceived. And nothing in either Billups or Simms suggests that the State was required to the use the second statutory definition. That these two cases happened to use the definition from RCW 9A.40.010(6)(b) does not make them applicable to a case in which the State charges restraint under RCW 9A.40.010(6)(a).

Christenson next contends that allowing the State to elect which definition to apply in scenarios involving children would produce absurd results because, he asserts, any time a non-parent physically restrains a child, even with parental consent, it would amount to criminal activity. This argument, however, ignores the other statutory elements of the crime. To prove unlawful imprisonment in that scenario, the State would still be required to show that such restraint is "without legal authority." RCW 9A.40.010(6).

- 22 -

We conclude that the language of RCW 9A.40.010(6) does not require the State to prove a lack of parental acquiescence every time the victim is younger than 16 years of age. Because the State elected to prove that Christenson directly restrained J.C. through force, intimidation, or deception, and the jury was so instructed without objection by Christenson, the State was not required to prove that P.B. opposed Christenson's conduct. There is sufficient evidence demonstrating that Christenson restrained J.C. without J.C.'s consent.

"Without Legal Authority"

Christenson next argues that there is insufficient evidence to prove that he restrained J.C. without legal authority. He maintains that, because P.B. authorized him to restrict J.C. to the bathroom under RCW 9A.16.100, the State failed to prove that locking J.C. in the bathroom was anything other than reasonable or moderate discipline.

RCW 9A.16.100 provides

It is the policy of this state to protect children from assault and abuse and to encourage parents, teachers, and their authorized agents to use methods of correction and restraint of children that are not dangerous to the children. However, the physical discipline of a child is not unlawful when it is reasonable and moderate and is inflicted by a parent, teacher, or guardian for purposes of restraining or correcting the child. Any use of force on a child by any other person is unlawful unless it is reasonable and moderate and is authorized in advance by the child's parent or guardian for purposes of restraining or correcting the child (emphasis added).

Again, Christenson did not raise this defense at trial. Nor did he contend that locking J.C. in the bathroom without bedding or heat was reasonable and moderate discipline. And there is more than sufficient evidence to establish that

Christenson acted without legal authority because his actions toward J.C. were so unreasonable.

Christenson argues that locking J.C. in the bathroom was "a reasonable and moderate means of punishing J.C.'s disobedience and preventing further self-harm." This contention ignores the conditions Christenson created in that room. He not only locked J.C. in the bathroom, under threat of harm and fearing for his safety should he try to leave, but Christenson left him with no working heater, no blankets, and no comfort of any kind. Christenson allowed J.C. out of this imprisonment only for meals —during which Christenson forced J.C. to sit on the floor and forbade him from interacting with his mother—and for forced exercise. No rational person could conclude that this was reasonable, moderate, or acceptable. This is especially true when considered in the context of the other physical and mental abuse that Christenson was perpetrating against J.C.

Knowledge

Finally, Christenson contends there is insufficient evidence demonstrating he knew he acted without J.C.'s consent and without lawful authority.

The State did not object to the to-convict instruction, which specified the State was required to prove Christenson knew he acted without consent and without legal authority, and the State therefore assumed the additional burden of proving this as the law of the case. State v. Dillon, 12 Wn. App. 2d 133, 142, 456 P.3d 1199 (2020). A person knows or acts knowingly or with knowledge when "[h]e or she is aware of a fact, facts, or circumstances or result described by a statute defining an offense; or [h]e or she has information which would lead a

reasonable person in the same situation to believe that facts exist which facts are described by a statute defining an offense." RCW 9A.08.010(1)(b)(i), (ii).

There is sufficient evidence demonstrating that Christenson acted knowingly with regard to both elements. The evidence demonstrates Christenson knew that he was restraining J.C. by force, intimidation, or deception[4] because he had to use force and the threat of force to keep him in the bathroom. Christenson installed a lock on the door to prevent J.C. from getting out, he hit J.C. for trying to leave the bathroom, and he monitored the door to make sure J.C. stayed locked up. This evidence is more than adequate to prove Christenson knew he was acting without J.C.'s consent.

The evidence is also sufficient to establish Christenson knew he was acting without legal authority. Christenson cautioned J.C. that he had to keep the abuse a secret, and J.C. testified that Christenson forced him to stop attending his online school because Christenson was afraid J.C. might report what was happening. This conduct demonstrates Christenson's consciousness of guilt and his corresponding knowledge that his actions were unreasonable. Because he knew they were unreasonable, a reasonable jury could conclude that Christenson knew his actions were without legal authority. The State presented sufficient evidence to support Christenson's conviction for unlawful imprisonment.

Based on the foregoing, we grant in part and deny in part Christenson's personal restraint petition. We vacate Christenson's second degree assault

---

[4] Because the State was not required to prove that Christenson acted without the mother's consent, the State was not required to prove that Christenson knew he acted without her consent.

conviction in count three and remand for resentencing as a result. We otherwise reject Christenson's claims.

WE CONCUR:

Andrus, C.J.

Mann, J.

Dwyer, J.